| | |
|---|---|
| **SUSAN KORNFELD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 34].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiff's purchase of Lot 18 (the "Lot") in

River Rock, a planned resort community in North Carolina.  After meeting

with River Rock's developer, Legasus of North Carolina, LLC ("Legasus")

and picking her Lot, the Plaintiff turned to Bank of America to finance her

purchase.  Legasus failed to complete the infrastructure and amenities in

River Rock and subsequently became insolvent, leaving the Plaintiff

owning land with a value significantly lower than the original purchase

price.  The Plaintiff now brings this action against Bank of America, seeking

to hold her lender legally responsible for her losses.

The Plaintiff initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiff then refiled an individual Complaint. Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiff's claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiff's remaining claims. For the reasons that follow, the Bank's motion will be granted.

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.   FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a summary of the relevant facts.

The Plaintiff Susan Kornfeld has been a member of a real estate investment club, has taken a real estate course, and at one point had a real

estate license. [Doc. 34-3, Deposition of Susan Kornfeld ("Kornfeld Dep.") at 13, 15, 33]. The Plaintiff learned about River Rock from Dan Seigle, a Los Angeles realtor who was in a real estate investment group with the Plaintiff. [Id. at 40-41, 34-36]. Seigle told the Plaintiff that River Rock was a good investment, and connected Plaintiff with the Wealth Architecture Group, which helped facilitate the purchase.[1] [Id. at 33–36, 41].

Seigle then introduced the Plaintiff to Mike Townsend, a sales executive for River Rock. [Id. at 44-45, 47]. Townsend told the Plaintiff that she was getting a River Rock lot "below what it was valued" and that it already had equity. [Id. at 46]. Townsend sent the Plaintiff a picture of the Lot, brochures about River Rock, and articles about people buying there, and told her that the Lot was in one of the better parts of the development. [Id. at 48, 49-50]. Townsend also sent the Plaintiff charts showing that the sales price of River Rock lots would increase around $50,000 with each stage, that there would be four or five stages, and that she was getting in at a stage one price. [Id. at 46, 47]. Upon reviewing these materials and

---

[1] Kornfeld has also relied on Seigle's recommendation to invest in a water rights company in Colorado, and on Wealth Architecture Group to purchase an undeveloped lot in Georgia at a development called Stillwater Coves. [Id. at 29, 39-40]. As with River Rock, the Plaintiff purchased in Stillwater Coves without visiting the development. [Id. at 30].

doing some online research into Legasus, Kornfeld thought River Rock looked like "a good development [that] was moving forward." [Id. at 52]. She continued to talk to Townsend, Siegel, and Suzy Brown, another friend who was considering buying there about the investment. [Id. at 52-53]. She did not speak with anyone else at Legasus, attend any sales events, or even visit River Rock before purchasing the Lot. [Id. at 54]. On January 12, 2007, long before she spoke with anyone from Bank of America, Kornfeld faxed Townsend a lot reservation contract and a copy of the check that would cover the 10% down payment. [Doc. 34-5, January 12, 2007 E-mail]. The Plaintiff did not intend to build on the Lot, but rather envisioned it as a "short-term flip." [Doc. 34-3, Kornfeld Dep. at 66].

Townsend gave the Plaintiff a list of loan officers with various banks who had loan products they were offering for River Rock purchasers. [Id. at 55]. Seigle and Brown advised the Plaintiff that Earl Oxendine with Bank of America had the best deal. [Id. at 56]. On January 22, 2007, the Plaintiff emailed Oxendine about financing for the Lot, requesting the loan product that had been mentioned in the list Townsend provided her. [Id. at 74-75; Doc. 34-6, January 22, 2007 E-mail]. Oxendine called her after receiving the email, and in that conversation said he thought River Rock "was a good

deal," that "[h]e liked the development," and that "he would like to buy a property there if he could afford it." [Doc. 34-3, Kornfeld Dep. at 75].

The other conversations Plaintiff had with Oxendine were "just about the loan" and how to fill out the application. [Id. at 76]. Oxendine never said anything about a relationship between Legasus and Bank of America. [Id. at 77]. Oxendine also told the Plaintiff that refinancing would be an option if she could not sell the Lot. [Id. at 93-94].

On January 25, 2007, the Plaintiff signed a Contract for Sale for Tuckasegee at River Rock. [Doc. 34-7, Purchase Agreement]. Under the Purchase Agreement, the Plaintiff agreed to purchase the Lot for $449,900.00. [Id.]. Bank of America is not mentioned in the Purchase Agreement and is not a signatory to the Purchase Agreement. [Id.]. Furthermore, the Plaintiff had not received any materials from Bank of America promoting River Rock prior to signing the purchase agreement. [Id. at 68].

On or about February 28, 2007, Plaintiff executed a note in the amount of $400,000, secured by a deed of trust, to purchase the Lot. [Doc. 34-8, Promissory Note; Doc. 34-9, Deed of Trust (collectively, the "Mortgage")]. The Plaintiff did not commission an appraisal of the Lot before purchasing, nor did she review the appraisal Bank of America

commissioned.  [Doc. 34-3, Kornfeld Dep. at 67, 91; Doc. 34-4, Plaintiff's Responses to First Requests for Admission at ¶5].  Nobody from Bank of America discouraged Plaintiff from travelling to River Rock or obtaining her own appraisal.  [Doc. 34-3, Kornfeld Dep. at 90 Doc. 34-4, Plaintiff's Responses to First Requests for Admission at ¶18].

On March 4, 2008, an employee of Wealth Architecture Group sent the Plaintiff an email informing her that she had visited River Rock, but could not tour it because of issues with road development.  [Doc. 34-10, March 4, 2008 E-mail].  The message went on to explain that there were "delays in getting permits for the [ ] infrastructure and that has affected their schedule by approximately 8 months."  [Id.].  Nevertheless, Wealth Architecture Group continued to tout the development, saying that lots at River Rock had appreciated an estimated 25% in value.  [Id.].  When the Plaintiff started "running out of money" to make payments, she attempted to re-sell the Lot through Legasus in mid-2008 but got no offers.  [Doc. 34-3, Kornfeld Dep. at 69; Doc. 34-11, June 27, 2008 E-mail].

As previously noted, the Plaintiff initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011.  Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV.  DISCUSSION

### A.  Statute of Limitations

In the present case, the Plaintiff asserts claims for fraud, violations of Chapter 75, and violations of ILSA.  Under North Carolina law, the statute of limitations applicable to fraud claims is three years.  <u>See</u> N.C. Gen. Stat. § 1-52(9).  This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  <u>Hunter v. Guardian Life Ins. Co.</u>, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, <u>disc. rev. denied</u>, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  <u>See</u> N.C. Gen. Stat. § 75-16.2.  While a Chapter 75 claim generally accrues when the violation of the statute occurs, <u>see</u> <u>Jones v. Asheville Radiological Group, PA</u>, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), <u>rev'd in part on other grounds</u>, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence.  <u>See, e.g.</u>, <u>Faircloth v. Nat'l Home Loan Corp.</u>, 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), <u>aff'd</u>, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[2], the statute of limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). The statute of limitations for an alleged violation of § 1702(a)(2)(D)[3] expires three years after the date of signing of the contract of sale. See 15 U.S.C. § 1711(a)(1). This limitations period, however, may

---

[2] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

> (A) to employ any device, scheme, or artifice to defraud;

> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

[3] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." 15 U.S.C. § 1703(a)(2)(D).

be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence." Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Generally, under North Carolina law, the issue of "when fraud should be discovered in the exercise of reasonable diligence is a question of fact for the jury." State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542, 548 S.E.2d 391, 397 (2003). Where, however, "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." Drinkard v. Walnut Street Sec., Inc., No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiff, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiff's claims are time barred. The Plaintiff

executed the Purchase Agreement for the Lot on January 25, 2007, and took possession upon closing on February 28, 2007, yet she waited over four years to initiate this action. The Plaintiff has failed to present a forecast of evidence that she did *anything* in this interim period to discover her causes of action against the Bank, nor has she shown that the Bank committed any affirmative act of fraudulent concealment to frustrate discovery despite her due diligence.

For all of these reasons, the Court concludes that the Plaintiff's claims are time-barred.

### B.   ILSA Claim

Even assuming that the Plaintiff's claims are not time-barred, the Plaintiff's claims under the ILSA are also subject to dismissal because the Plaintiff has failed to present a forecast of evidence that Bank of America is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiff during the lot purchase.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires

sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or

sale of property that liability may arise under ILSA." Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Legasus. Bank of America provided no funding for the River Rock development. [Doc. 42-15, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 6]. Further, Bank of America did not sell the lot to the Plaintiff and was not a party to the Purchase Agreement.

To the extent that the Plaintiff contends that the Bank engaged in marketing activities on behalf of the developer, the Plaintiff has failed to present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiff has not presented any forecast of evidence that Bank of America engaged in any marketing of *River Rock*, as opposed to the loan products it offered to River Rock purchasers.

The Plaintiff also argues that because she never received a HUD property report from Legasus, as required by the ILSA, she had the right to rescind the Purchase Agreement. The Plaintiff contends that Oxendine's alleged misrepresentations somehow prevented her from subsequently rescinding her Purchase Agreement within the statutory two-year period. See 15 U.S.C. § 1703(c). Notably, the Plaintiff does not allege such a claim in her Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiff has

not presented any forecast of evidence that the Bank was aware that the Plaintiff had not received a Property Report or that it misrepresented any material facts in order to induce the Plaintiff to refrain from rescinding the purchase agreement on this basis. In any event, this argument is belied by the Defendant's forecast of evidence that the Plaintiff received a copy of the Property Report on January 17, 2007, prior to executing the Purchase Agreement. [Doc. 37-3, January 17, 2007 Letter]. Accordingly, to the extent that the Plaintiff attempts to argue that the Bank induced her to forego a statutory right to revoke the Purchase Agreement, this argument fails.

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of River Rock within the meaning of the ILSA. Accordingly, the Plaintiff's claims under the ILSA are dismissed.

### C. Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false

representations was reasonable.   See id.   "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiff had with Oxendine in the course of securing financing for her lot purchase do not support a claim of fraud. First, most of Oxendine's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a potential investment.   "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud."  Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984).   North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable "if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener."  Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999).   The Plaintiff, however, has failed to present a forecast of evidence that Oxendine made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiff claims to have been misled by Oxendine's representations regarding the high demand for River Rock lots (or North Carolina land in general), the Plaintiff has failed to present a forecast of evidence that such statements were actually false. Furthermore, to the extent that the Plaintiff claims to have been misled by Oxendine's representations that she would be able to refinance her lot if she could not sell it, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Oxendine's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence that the Plaintiff's reliance on such statements was reasonable. "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to

invest the property with exaggerated value does so at his peril, and must take the consequences of his own imprudence.")).

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be expected." See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part). The Plaintiff contends that Oxendine's statements are distinguishable because his statements were made not in course of promoting of the Bank's loan products but rather were made in course of promoting the *developer's* product, that is, the River Rock development, and that he made such statements with "seeming objectivity." [Doc. 36 at 19]. At bottom, however, Oxendine was a loan officer, and he was acting in the course and scope of his duties as a loan officer in marketing and selling the Bank's financial services to a potential customer. That he appeared to affirm and approve of the Plaintiff's decision to purchase in River Rock does not change this fact. The Plaintiff has presented no forecast of evidence to show that Oxendine went outside of the scope of being a lender in making such statements.

Further, it was unreasonable for the Plaintiff to rely on Oxendine's opinions when the Purchase Agreement expressly disclaimed any potential

economic benefit to the Plaintiff.  [Purchase Agreement, Doc. 34-7 at ¶ 23

("The Purchaser acknowledges and agrees that the Seller has not

promised, suggested, or indicated in any way that the Purchaser will

receive any economic benefit whatsoever as a result of the Purchaser's

ownership of the Lot, and Seller does hereby disclaim any such promise,

suggestion or indication made by any person whatsoever.")].

Finally, the Plaintiff's claim of reliance is unjustified because he had

ample opportunity to conduct an independent investigation of the property

and reach his own conclusions about the development and its risks prior to

purchasing the property but failed to do so. As the North Carolina Court of

Appeals has explained:

> In cases involving the purchase of real property,
> "[r]eliance is not reasonable if a plaintiff fails to
> make any independent investigation" unless the
> plaintiff can demonstrate: (1) "it was denied the
> opportunity to investigate the property," (2) it "could
> not discover the truth about the property's condition
> by exercise of reasonable diligence," or (3) "it was
> induced to forego additional investigation by the
> defendant's misrepresentations."

Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 209, 675

S.E.2d 46, 52 (2009) (quoting RD & J Properties v. Lauralea–Dilton

Enters., LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).  Here,

the parties were engaged in an arm's length transaction.  The Plaintiff was

a sophisticated investor, seeking to "flip" the property in a relatively short period of time for a profit.  Significantly, the Plaintiff has not presented a forecast of evidence to suggest that the Bank denied her the opportunity to inspect the property or that she was otherwise induced to forego additional investigation as a result of Oxendine's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiff.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed.  In so holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the

developer and could not otherwise be readily or easily verified. Id. at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiff has failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in River Rock.  Moreover, the Plaintiff has failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiff. Indeed, the Plaintiff had many means available to her to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property.  The Plaintiff, however, chose to forego any independent investigation of her investment prior to purchase.  Under these circumstances, the Bank cannot be held liable for the Plaintiff's failure to conduct her own due diligence.

Further, the Plaintiff's asserted reliance was unjustified because her relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiff was making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a

legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development].”), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) (“a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party”).[4]

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiff's fraud claim.

### D.    Chapter 75 Claim

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show “(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business.” Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991).  A deceptive practice is one that

---

[4] To the extent that the Plaintiff bases her fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiff has not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiff has offered no forecast of evidence that she relied on these appraisals in purchasing their property. Indeed, the Plaintiff never even saw an appraisal before entering into the purchase agreement.

has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Id. at 461, 400 S.E.2d at 482.

To the extent that the Plaintiff's Chapter 75 claim is derivative of her claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiff contends that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting River Rock as an investment, including by advising Plaintiff of the quality of the subdivision in early 2007, and withholding information about the electrical problems." [Doc. 36 at 20]. The Plaintiff's assertions that the Bank should be held liable for its close association with Legasus, however, are insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent agent of the developer. See In re Fifth Third Bank, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales

program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiff appears to have abandoned her Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice. Even if the Plaintiff were to pursue this theory, however, her claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiff did not even see an appraisal prior to closing and, in any event, her Purchase Agreement was not dependent on such appraisal. As such, the Plaintiff could not have reasonably relied on the appraisal in proceeding with her lot purchase. See In re Fifth Third Bank, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have suffered, we conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiff cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent her from finalizing her lot purchase during the origination and underwriting process. The Plaintiff, like

the other Plaintiffs who have filed similar actions against the Bank, appears to argue that because the Bank was required to perform some due diligence to assess its risk in deciding whether to make the Plaintiff a loan, the Plaintiff should be entitled to rely on the Bank's representations as to the result of that due diligence inquiry.  That, however, is not the law.  The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiff outside of that role.  See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913.  Thus, there is no contractual duty to the borrower to make any assurances about the product that the borrower is buying.  Moreover, a bank performs its due diligence investigation for the purpose of conducting (and protecting) *its business* – not its customers. There is no fiduciary duty that arises to the borrower.   Thus, the Bank had no obligation to advise the Plaintiff regarding the quality of the investment for which she sought financing.  See In re Fifth Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[5]

---

[5] Because the Court concludes that the Plaintiff's Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiffs' place

In sum, the Plaintiff has not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive action during the Plaintiff's lot purchase. Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiff's claim under Chapter 75.

## V. CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 34] is **GRANTED**, and this action is hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge

---

of residence outside of the State of North Carolina precludes her recovery under Chapter 75.